PER CURIAM:
Thomas Deczem Bassanguen is a native and citizen of Cameroon. He was admitted into the United States under a nonim-migrant visitor’s visa on July 5, 2005, with authorization to remain in the United States until September 4, 2005. He subsequently filed an affirmative application for political asylum, withholding of removal, and protection under the Convention Against Torture (“CAT”). The Immigration Judge (“IJ”) denied all forms of relief sought by Bassanguen, based upon an adverse credibility determination, and the Board of Immigration Appeals (“BIA”) affirmed. Bassanguen now petitions this court for review of the decision of the BIA. For the reasons that follow, we grant the petition for review in part, vacate the BIA’s order, and remand for reconsideration.
I.
A.
In his application for relief, Bassanguen claims to be a member of the Social Democratic Front (“SDF”), an opposition party in Cameroon. He asserts that he was arrested and subjected to persecution because of his SDF membership on three separate occasions.
First, Bassanguen testified that he was arrested on May 24, 1997, detained for three days, and subjected to inhumane and claimed that he was forced to undress to his underwear, confined in a urine-saturated cell with no sanitation facilities, and *279 forced to lie on a cement floor, which caused him to experience nausea, vomiting, and pain.
Second, Bassanguen testified that he was arrested on June 30, 2002, and detained for five days. He claimed that he was subjected to similar inhumane conditions, as well as repeated, brutal beatings and kickings by prison officials. He claimed that, after he was released, he experienced pain and difficulty walking as a result of the beatings he sustained during this detention. In December 2002, Bassanguen traveled from Cameroon to Nigeria and, following a ten-day stay, voluntarily returned to Cameroon without difficulty or arrest.
Bassanguen testified that he was arrested for the third and final time on November 6, 2004, and detained for eight days. He testified that he was again subjected to inhumane conditions, including being forced to carry buckets of urine from the cells and being subjected to repeated beatings. He testified that he escaped from this detention with the help of a police officer, but he offered contradictory testimony as to whether he was also assisted and accompanied by his lawyer during the escape. Shortly thereafter, Bassanguen went to the United States Embassy in Cameroon and was issued a nonimmigrant visitor’s visa. He arrived in the United States on July 5, 2005.
Bassanguen asserts that he is eligible for asylum based on the three incidents of arrest and past persecution as well as a fear of future persecution if he returns to Cameroon. Bassanguen testified that he has remained a member of the SDF party in the United States since his arrival here and that he fears the Cameroonian government has been made aware of his activities. Bassanguen testified that he attended his first SDF meeting in the United States in August 2005, that he has participated in one demonstration in this country, and that he has attended as many as five more SDF meetings since August 2005. He testified that the last meeting he attended was in November 2009, approximately two months prior to the hearing before the IJ.
In addition to his own testimony, Bas-sanguen presented the testimony of Dr. Mary Cogar, a clinical psychologist, and Enid Duplex Kuissu, a fellow SDF member. He also submitted a number of documents and letters from family members and SDF officials.
B.
On March 19, 2012, the IJ issued an oral decision denying Bassanguen’s applications for asylum, withholding of removal, and protection under the CAT, and ordering Bassanguen removed to Cameroon. Applying the REAL ID Act of 2005, the IJ found that Bassanguen “was not sufficiently credible in his testimony.” J.A. 279. In support, the IJ cited the following inconsistencies and inaccuracies in Bassan-guen’s evidence, in conjunction with “unre-butted evidence which reflects random fraud of certain documents coming out of Cameroon.” J.A. 277.
Bassanguen submitted documents purported to be from his wife, who remained in Cameroon. Bassanguen admitted, however, that the signature on at least one of the documents did not appear to be the signature of his wife, which the IJ found to be “fundamentally dishonest.” J.A. 274. Later in his testimony, Bassanguen speculated that his wife may have deliberately changed her signature out of fear of retaliation by the Cameroonian government, but the IJ found this explanation not credible because the document clearly designated Bassanguen’s wife as the author of the letter, regardless of the signature.
*280 Bassanguen submitted letters from an SDF official in Cameroon that contained inconsistent information. The first letter contained inaccuracies about Bassanguen’s activities that a second letter attempted to correct, but the second letter provided no explanation as to why the errors had occurred in the first place. The letters submitted were purportedly from the same SDF official in Cameroon, but were on different letterheads. Also, Bassanguen’s SDF membership card contained different issue dates, which Bassanguen could only attribute to an unexplained mistake.
A letter purportedly written by a leader in the SDF party, Chief Taku, regarding Bassanguen’s third arrest in Cameroon was also submitted. Chief Taku dates Bassanguen’s third arrest in Cameroon as occurring on November 6, 2005. This was contrary to Bassanguen’s testimony that the arrest occurred on November 6, 2004, and the fact that Bassanguen was in the United States in November 2005. When the IJ questioned Bassanguen as to why he abandoned his plan to present Chief Taku as a witness, Bassanguen explained that he removed Chief Taku as a witness because he realized that Chief Taku “doesn’t hold the same position as he used to” with the SDF. J.A. 377. However, Bassanguen’s advance notice to the court advised that Chief Taku would not be called as a witness for “personal reasons,” and would not have affected the substance of his testimony regarding the arrest. J.A. 275. Bassanguen’s explanation at the hearing also contradicted Kuissu’s testimony regarding Chief Taku’s continued leadership role in the SDF organization in the United States.
Bassanguen’s testimony about his continued participation in the SDF party in the United States and his attendance at SDF meetings was also inconsistent with the testimony of Kuissu. Kuissu testified that he did not believe that Bassanguen was still a member of the SDF. He testified that he last saw Bassanguen at an SDF meeting in 2008, and that he was present at but did not see Bassanguen at the November 2009 meeting.
Finally, the IJ found that Bassanguen’s voluntary return to Cameroon from Nigeria after his second arrest undermined the credibility of his claim that he is afraid to return. The IJ additionally found that Bassanguen’s explanation for his return did not adequately address these credibility concerns.
Having considered the entirety of the evidence presented, including the discrepancies found therein, the IJ rendered her adverse credibility determination, as follows:
So considering the totality of the circumstances, the Court finds that the respondent was not sufficiently credible in his testimony. His fact witness [Kuissu] was not sufficiently credible. The overseas documents were not sufficiently probative and credible. The document generated by Chief Taku, because of a material inconsistency, is not probative. The respondent has failed to meet his legal burden to demonstrate that he was the victim of past persecution in Cameroon. I have considered whether or not, based on his activities in the United States, he has a well-founded fear of future persecution. Because of conflicting information regarding the status of his activities in the United States and given what the Court perceives, in any event, to be his low level of participation in the SDF at this point, the Court does not find that the respondent has met his legal burden to show that he has an objectively reasonable fear and in any event, the Court still does not credit the respondent’s contention, at this point in time, that he has a *281 fear that is subjectively genuine given the fact that he has on another occasion, after he claim[s] having been arrested and detained, returned voluntarily to Cameroon.
J.A. 279. Consequently, the IJ denied Bassanguen’s asylum claim and his request for withholding of removal. Citing the same inconsistencies as well as several additional ones, the IJ also denied Bassan-guen’s request for relief under the CAT.
On appeal, the Board held that the IJ’s adverse credibility determination was not clearly erroneous, concluded that Bassan-guen did not submit adequate corroborating evidence to overcome the IJ’s concerns with Bassanguen’s credibility, and affirmed.
II.
A.
The Immigration and Nationality Act (“INA”) authorizes the Attorney General to grant asylum to an alien who qualifies as a “refugee.” See 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A). A “refugee” includes “any person who is outside any country of such person’s nationality ... and who is unable or unwilling to return to, and is unable or unwilling to avail himself ... of the protection of, that country because of persecution or a well-founded fear of persecution on account of political opinion.” 8 U.S.C. § 1101(a)(42)(A); see Zelaya v. Holder, 668 F.3d 159, 161 (4th Cir.2012). The applicant bears the burden of proving refugee status. See Zelaya, 668 F.3d at 161.
The INA also provides for the withholding of removal. See 8 U.S.C. § 1231(b)(3)(A); Camara v. Ashcroft, 378 F.3d 361, 367 (4th Cir.2004). The burden for prevailing on this claim is higher than under an asylum claim because the petitioner “must show a clear probability of persecution on account of a protected ground.” Djadjou v. Holder, 662 F.3d 265, 272 (4th Cir.2011) (internal quotation marks omitted). Because the burden of proof for withholding of removal is higher than for asylum, an applicant who is ineligible for asylum is necessarily ineligible for withholding of removal. See id.
Finally, the CAT “prohibits the United States from returning any person to a country where the person has demonstrated that it is more likely than not that he will be tortured if returned to such country.” Zelaya, 668 F.3d at 161.
B.
The scope of our review of the BIA’s decision “is narrow and deferential.” Djadjou, 662 F.3d at 273; see also Danham v. Gonzales, 495 F.3d 113, 119 (4th Cir.2007). We will uphold the denial of an asylum claim “unless such denial is manifestly contrary to the law and an abuse of discretion.” Zelaya, 668 F.3d at 165 (internal quotation marks omitted). “When the denial of asylum is based on the conclusion that the applicant failed to meet his evidentiary burden for establishing eligibility, then we review for substantial evidence and must affirm a determination of statutory ineligibility by the BIA unless the evidence presented was so compelling that no reasonable factfinder could fail to find eligibility for asylum.” Dankam, 495 F.3d at 119 (internal quotation marks omitted).
“Our review of an adverse credibility determination is [also] limited to ensuring that substantial evidence exists to support it.” Djadjou, 662 F.3d at 273. “We accord broad deference to the agency’s credibility determination,” but the “deference ... is not absolute.” Id. “[T]he agency must provide specific, cogent reasons for *282 making an adverse credibility determination.” Id.
Under the provisions of the REAL ID Act of 2005, the testimony of an applicant alone can be sufficient to meet the applicant’s burden of proof if the IJ is satisfied that the applicant’s testimony is credible. See 8 U.S.C. § 1158(b)(l)(B)(ii). The IJ’s credibility determination is governed by the following provision:
Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant’s or witness’s account, the consistency between the applicant’s or witness’s written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant’s claim, or any other relevant factor.
8 U.S.C. § 1158(b)(l)(B)(iii).
Thus, as we have observed, “omissions, inconsistent statements, contradictory evidence, and inherently improbable testimony are appropriate bases for making an adverse credibility determination. The existence of only a few such inconsistencies, omissions, or contradictions can be sufficient for the agency to make an adverse credibility determination as to the applicant’s entire testimony regarding persecution.” Djadjou, 662 F.3d at 273-74 (citations omitted). The determination may not, however, be based on speculation, conjecture, or otherwise unsupported personal opinion. See id. at 274.
III.
The IJ in this case grounded her adverse credibility determination on several inconsistencies within Bassanguen’s testimony, as well as inconsistencies between Bassanguen’s testimony and the corroborating evidence submitted in support of his claims.
On appeal, Bassanguen challenges the IJ’s reliance upon three of these alleged inconsistencies: (1) Bassanguen’s acknowl-edgement that at least one of the letters purporting to be from his wife did not appear to contain her signature; (2) Bas-sanguen’s voluntary departure and return to Cameroon in 2002, following two incidents in which he was allegedly arrested, detained, subjected to inhumane conditions, and persecuted; and (3) the discrepancy between Bassanguen’s testimony and Chief Taku’s letter regarding the alleged date of Bassanguen’s third arrest in Cameroon.
We reject Bassanguen’s first two challenges to the adverse credibility determination. The inconsistent signatures of Bassanguen’s wife on letters submitted in support of his claims, and Bassanguen’s acknowledgement that he submitted the letters even though at least one signature did not match that of his wife, was appropriately considered as a matter affecting his credibility. The IJ was also entitled to consider, as a part of the adverse credibility determination, Bassanguen’s testimony that he voluntarily return to Cameroon in December 2002. This voluntary return would have occurred after two alleged pri- or incidents of persecution, the latter of which occurred a mere six months before the voluntary return and involved several days of inhumane treatment and beatings. *283 See, e.g., Loho v. Mukasey, 581 F.3d 1016, 1018 (9th Cir.2008); Ngarurih v. Ashcroft, 371 F.3d 182,189 (4th Cir.2004). Although Bassanguen claims that he only decided to seek asylum alter the third incident of detention and inhumane treatment, the BIA correctly concluded that the “voluntary return after two arrests is a valid consideration, when considered along with the inconsistencies and other issues” in his evidentiary presentation. J.A. 4.
The IJ’s and the Board’s reliance upon the discrepancy between Bassan-guen’s testimony and Chief Taku’s letter regarding the date of Bassanguen’s third arrest in Cameroon, however, is problematic. The precise date varies only in the year of the arrest (November 6, 2004 versus November 6, 2005), and it is undisputed that Bassanguen was in the United States in November 2005. Thus, at oral argument, the Attorney General rightly conceded that the date discrepancy alone was most likely a mere typographical or clerical error.
The IJ additionally observed that Bas-sanguen failed to offer a consistent explanation as to why he removed Chief Taku as a witness at the hearing, and that Chief Taku could have explained the discrepancy in the date had he testified. Nevertheless, the IJ and the Board both characterized the discrepancy in the date alone as a material one supporting the adverse credibility determination. It also appears that the IJ may have relied upon the error to reject portions of the other corroborating evidence. Because we cannot presume that the IJ would have weighed the other factors the same had it disregarded the perceived inconsistency between Chief Taku’s letter and Bassanguen’s testimony, or that the Board would have reviewed the decision the same, remand is necessary to allow the IJ and the BIA to reassess Bas-sanguen’s credibility under the totality of the circumstances, without regard to this single discrepancy.
IV.
For the foregoing reasons, we grant Bassanguen’s petition for review in part, vacate the Board’s order, and remand the matter for further consideration consistent with this opinion.

PETITION GRANTED IN PART; VACATED AND REMANDED.